**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | 1:16 CR 463-2 |
| v. | ) ) ) | Judge Virginia M. Kendall |
| JUAN JIMENEZ | ) ) ) | |

## MEMORANDUM OPINION AND ORDER

A jury convicted Juan Jimenez of conspiracy to engage in racketeering activity. *See* 18 U.S.C. § 1962(d). Jimenez moves for judgment of acquittal on the grounds that the evidence presented at trial was insufficient to sustain the verdict or, in the alternative, for a new trial based on the arguments raised by his codefendant, Miguel Denava. (*See generally* Dkt. 1786). For these reasons—as well as those stated in the companion case, *United States v. Denava*, No. 16 CR 463-17—the motion is denied. (*Id.*)

## DISCUSSION

"A jury verdict will only be overturned 'if, after viewing the facts in the light most favorable to the government, there was insufficient evidence to convict.'" *United States v. Perryman*, 20 F.4th 1127, 1133 (7th Cir. 2021) (quoting *United States v. Jett*, 908 F.3d 252, 273 (7th Cir. 2018)); *see also* Fed. R. Crim. P. 29. This is no easy feat. *See id.* ("We have described this challenge for the defendant as an uphill battle, a momentous task, a heavy burden, and a nearly insurmountable hurdle …" (cleaned up)). The defendant bears the burden of establishing that *no reasonable jury* could find him guilty beyond a reasonable doubt. *United States v. Moore*, 572 F.3d 334, 337 (7th Cir. 2009)) (emphasis added). "Such a challenge leads to a reversal only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable

1

doubt." *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010) (cleaned up). Jimenez has not cleared the "nearly insurmountable hurdle." *Jett*, 908 F.3d at 273.

The Racketeer Influenced and Corrupt Organizations Act ("RICO") exists "to eradicate organized crime by 'bring[ing] the often highly diversified acts of a single organized crime enterprise under RICO's umbrella.'" *United States v. Irizarry*, 341 F.3d 273, 293 n.7 (3d Cir. 2003) (quoting *United States v. Eufrasio*, 935 F.3d 553, 566 (3d Cir. 1991)). To that end, the law imposes criminal and civil liability upon those who engage or conspire to engage in certain "prohibited activities," defined as "racketeering activity" or the "collection of an unlawful debt." *H.J. Inc. v. Nw. Bell Telephone Co.*, 492 U.S. 229, 232 (1989); *see also* 18 U.S.C. § 1962. A RICO conspiracy has three elements: (1) an agreement to conduct or participate in the affairs (2) of an enterprise (3) through a pattern of racketeering activity.'" *United States v. Brown*, 973 F.3d 667, 682 (7th Cir. 2020) (quoting *United States v. Olson*, 450 F.3d 655, 664 (7th Cir. 2006)); *see also Salinas v. United States*, 522 U.S. 52, 61–66 (1997); 18 U.S.C. § 1962(d). Viewed in the light most favorable to the government, a reasonable jury could conclude that Jimenez agreed to engage in the affairs of an enterprise, the Latin Kings, through racketeering activity.

### Agreement & Enterprise

An enterprise is "any individual partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The phrase "any union or group of individuals associated in fact" means a group "associated together for a common purpose of engaging in a course of conduct." *United States v. Volpendesto*, 746 F.3d 273, 284 (7th Cir. 2014) (quoting *Boyle v. United States*, 556 U.S. 938, 944 (2009)). This definition is broad. *See United States v. Brown*, 973 F.3d 667, 682 (7th Cir. 2020) ("The Supreme Court reads [§ 1961(4)] broadly."); *see also Boyle*, 556 U.S. at 944 ("This

2

enumeration of included enterprises is obviously broad …."); *United States v. Bergrin*, 650 F.3d 257, 267–68 (3d Cir. 2011) ("[T]he Court has repeatedly pointed to RICO's legislative history and § 904(a) of the Organized Crime Control Act of 1970 as evidence that Congress intended to create a broad and powerful new statutory weapon …."). All that is required is "evidence of an ongoing organization, formal or informal, and … evidence that the various associates function as a continuing unit." *Kaye v. D'Amato*, 357 F. App'x 706, 711 (7th Cir. 2009) (quoting *Boyle*, 556 U.S. at 945)). That requirement was more than met.

The testimony of several Latin King members—Fernando Chavez, Alexander Vargas, and Paulino Salazar—described the nature of their "enterprise." The Latin Kings was—and still is—a national gang divided geographically into regions, which, in turn, were further divided into chapters. (Chavez Tr. 267–68; Vargas Tr. 1223–25). Regions had leadership structure. The Regional Inca led the region; the Regional Enforcer enforced discipline and adherence to rules and by-laws; and the Regional Treasurer collected dues from the region's chapters. (Chavez Tr. 261). Dues collected from members were used for guns and—when members were arrested or charged with gang-related crimes—for bail and legal services. (Chavez Tr. 261, 267–68; Vargas Tr. 1256–57). Young men seeking to join the group had to endure a recruiting process, during which they proved themselves by carrying firearms, patrolling the neighborhood, committing acts of violence, and participating in other gang activity. (Chavez Tr. 224–25; Salazar Tr. 921, 924–26). Once accepted, these recruits became "soldiers" in each chapter, accountable to the chapter leadership, who were accountable to the regional leadership. (Chavez Tr. 261).

Latin Kings members wore black and gold and developed ways to signal association with the organization. (Chavez Tr. 265; Salazar Tr. 947). Their symbols included a five-pointed crown, with each point representing a different value ("love, honor, obedience, sacrifice, and

righteousness"); lions; a mascot called the Latin King Master; the letter "K," standing for King; and the letters "LK," standing for Latin King. (Chavez Tr. 207–08; Salazar Tr. 948). Slogans and hand signs also showed solidarity, such as "King Love," "Amor de Rey," and the hand sign in the shape of a crown. (Chavez Tr. 267, 470).

Strict rules governed the gang, and strict consequences for rule violations ensured compliance. The southeast region, for example, required paying dues, attending chapter meetings, holding security in the neighborhood, and retaliating against rival gangs. (Vargas Tr. 1295–1324). At chapter meetings, members discussed gang business, including violent conflicts with rival gang members, and whether other members of the Latin Kings were in bad standing. (Chavez Tr. 312). Minor rule violations were punished by beatings. (Chavez Tr. 625). More serious breaches led to "Smash" or "Shoot" on sight orders ("S.O.S."). (Chavez Tr. 297–98). And for the worst transgressions, the regional officer or chapter Inca ordered a "Kill on Sight" (K.O.S.). (*Id.*)

Jimenez—taking an untethered position—claims that the Latin Kings largely functioned as a positive, social-justice-oriented institution. "[T]he Constitution required members to demonstrate leadership, become aware of social and political problems for Latinos, to aid in the search of peace and unity, and promote academic and vocational training." (Dkt. 1786 at 6–7). The "drug trafficking and violence," in contrast, can be attributed to the actions of a few "individual Latin Kings." (Dkt. 7). One wonders how such a sentence worked its way into a legal brief. Jurists and juries alike can see past poorly constructed façades. Cosa Nostra does not exist to promote Italian culture; Bonnie and Clyde were not wholesome cross-country travelers; and Bernie Madoff did not operate Madoff Investment Securities for philanthropic giving. Make no mistake. The purpose of the Latin Kings was clear: "to expand, try to take more territory, and just try to be the dominant organization out [] in the United States" to "get more members, more money, and [] just

4

dominate … everything." (Vargas Tr. 1222–23, 1255, 1258). One regional leader was particularly blunt. The Latin King gang existed for "violence," "extorting people," "extorting businesses," "robbing drugs," and "robbing drug dealers." (Salazar Tr. 942). Suggesting otherwise minimizes the seriousness of the toll that urban gangs inflict upon communities.

Moreover, Jimenez unambiguously affiliated with the Latin Kings. A defendant enters into an "agreement" if he was "aware of the essential nature and scope of the enterprise and intended to participate in it." *United States v. Useni*, 516 F.3d 634, 646 (7th Cir. 2008) (quoting *United States v. Swan,* 250 F.3d 495, 499 (7th Cir. 2001)); *see also id.* (explaining that an agreement "to facilitate the activities of those who are operating an enterprise" can be shown either through direct or circumstantial evidence). Several people explained to the jury that Jimenez joined the Latin King Dolton Chapter as a solider in 2003, rising to enforcer, then regional treasurer. (Zambrano Tr. 2147–48; Bravo Tr. 2249, 2262; Vargas Tr. 1425; Delgado Tr. 3321). While a solider, he served a member of an Inca's security detail, sometimes armed, earning a reputation as a "standout." (Vargas Tr. 1412, 1416–18). Later as a regional enforcer, he took a more active role in shaping the organization by revising the Latin Kings' laws, if only to make a superficial change to draw attention away from the retaliation rule. (Quiroz Tr. 1876, 1959–61; Vargas Tr. 1317). Upon promotion to treasurer, he rigorously collected money from all those owing dues, as captured by testimony and wire recordings. (Peetz Tr. 3240-41; Government Exhibit 5188-A).

Jimenez also identified with the Latin Kings through signals. He "shook up," an accepted gang practice, with Regional Inca Vargas, Regional Enforcer Chavez, and Latin King "Miguel Denava" dozens of times. (Vargas Tr. 1410, 1413–14, 1479). He had Latin King tattoos on his body: lions facing handguns, inspired by the Latin King emblem, on his abdomen, and a lion baring its teeth on his right wrist and hand. (Govt. Ex. 3402). In one photo, Jimenez is next to a Latin

5

King "throwing up the crown" in support while Jimenez "drops the forks," a showing of disrespect toward a rival gang. (Gov. Ex. 3104; Bravo Tr. 2266–67).

### Pattern of Racketeering Activity

A pattern of racketeering activity involves two or more "related predicate acts" of "racketeering activity" committed within a ten-year period by some member or members of the conspiracy. *United States v. Farmer*, 38 F.4th 591, 602 (7th Cir. 2022). "Related predicate acts" have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 828 (7th Cir. 2016) (quoting *H.J. Inc.*, 492 U.S. at 237). "Racketeering activity" encompasses a broad range of activities, including witness tampering, "murder, attempted murder, arson, robbery, extortion, and drug trafficking." *Farmer*, 38 F.4th at 602; *see also* 18 U.S.C. § 1961(1). And the defendant need not have committed those acts; it suffices that "a particular defendant agreed that *a member* of the conspiracy would commit two predicate racketeering acts, not that the particular defendant committed or agreed to commit two predicate acts himself." *United States v. Benabe*, 654 F.3d 753, 776 (7th Cir. 2011) (citing *Salinas v. United States*, 522 U.S. 52, 65–66 (1997)).

The evidence at trial, drawn from several witnesses and exhibits, shows that Jimenez conspired as a member of the Latin Kings to commit at least two crimes of "racketeering activity," including attempted murder, witness tampering and intimidation, extortion, and drug trafficking. On November 3, 2003, Jimenez was driving his car with another Latin King in the passenger seat when he pulled behind Fabian Salgado, a twenty-two-year-old man unaffiliated with any gang, and Salgado's friend. (Salgado Tr. 1576–79, 1583–84). Jimenez wrongly believed that there was a member of the Satan Disciples gang, Debo, in the car. (Bravo Tr. 2249–52). Jimenez's passenger

6

fired several shots at Salgado's van, as Jimenez himself sped away. (Weckler Tr. 1591–92; Connors Tr. 1607–13). To compound matters, Salgado's Latin King cousin, Gabriel Carbajal, directed Salgado not to press charges against Jimenez, who was his friend. (Salgado Tr. 1584–87); *see also* 18 U.S.C. § 1512(b) (criminalizing the conduct of any person who "uses intimidation, threatens, or corruptly persuades another person … with intent to … cause or induce any person to" withhold testimony, conceal a relevant court object, evade legal process, or be absent from an official proceeding). Salgado did so anyways, and Jimenez later pleaded guilty to aggravated unlawful use of a weapon in state court the following year. (Stipulation, Tr. 1621–22).

Later, when Jimenez assumed his position as regional treasurer, he discussed killing Fernando Chavez ("Fester"), a cooperator, with Edward Delgado, the chapter's Inca, and Carlos Padilla, the regional enforcer. Jimenez said, "the nation wanted Fester dead." (Delgado. Tr. 3479–81). Latin Kings burned Chavez's mother's garage, torched his girlfriend's car, and shot at his home. And the evidence suggests that Jimenez was equally ruthless in collecting dues. He ordered punishments for violations stemming from delinquent debtors. In one instance, he had Ricardo Denava beat for one minute, head to toe, for not paying money, as well as doling out a violation to Caveman for not handing over narcotics proceeds owed to the chapter. (Salazar Tr. 1038–44).

Finally, Jimenez, as part of the Latin Kings' general operation, engaged in widespread drug-trafficking. Contrary to Jimenez's submission, he was personally involved—not that personal involvement is necessarily required. *See United States v. Garcia*, 854 F.3d 460, 477 (7th Cir. 2014). He told Luis Bravo, another Latin King, that he was selling cocaine to Cavillo and that he was supplied by the Latin Kings between 2013 and 2015. (Bravo Tr. 2260–62). Bravo also said that Jimenez delt drugs since 2007, and Edward Delgado corroborated the testimony by recounting how a Latin King provided Jimenez's name in a list of drug dealers. (Delgado Tr. 3375–77).

7

Moreover, a police officer discovered, during a traffic stop, "green-tinted small baggies containing a white [] rocky substance" by Jimenez's feet and on his person. (Robitz Tr. 1618–20). Tests confirmed the substance was cocaine, and Jimenez pleaded guilty to cocaine possession shortly thereafter. (Stipulation, Tr. 1622–24).

## CONCLUSION

For these reasons, Jimenez's motion for acquittal or, in the alternative, a new trial is denied. (Dkt. 1786).

Virginia M. Kendall
United States District Judge

Date: July 25, 2023